Good morning, your honors. My name is Linda Sheffield and I represent Patrick Patterson. I believe the most important aspect of this case is the lack of counsel for Mr. Patterson. Early on, he recognized his inability to actually present his case without a lawyer. This is not something where somebody knew what was going to happen. This is a case of him being in a high-security prison. There's hazard, there's risk. It's pretty much undisputed. It depends on which order you read or which statement you read. But basically, he had had a scuffle with Mr. Black earlier that day. He said they thought everything was fine. They went to bed in the middle of the night. Black attacks him and takes his eye. One of the points you make is that while the case might not be in the abstract, particularly complex as a legal matter, there's some factual difficulties that need to develop. One thing I couldn't get a clear picture of, there didn't seem to be a diagram in the record anywhere, was exactly what the configuration of these cells, these barracks were with respect to the control booth. Exactly. That is the exact problem with this case, your honor, which is why I called Sheila Campbell from the crime case to find out exactly what it is that you would need to prove in a case like this. That's why I filed her affidavit. She explained all of the different areas that a lawyer would be allowed to go into, which Patrick Patterson recognized in his motions for counsel. If you read his motion, the first motion, he says, I'm never going to get granted access to any of these interviews. And then in his next motion, he's basically saying the same thing. And the government was playing games with him. They weren't letting him see the video. It took him five months to get to see an incomplete video. So based on what Sheila Campbell told me and based on what was presented in the crime case, there are staffing requirements, there are shift rosters, there are incident reports, there are the barracks rosters. And these are things that inmates don't get. The inmates don't get, when they're litigating themselves, they don't get to see the design of the prison. There's a security problem with that. So when you are trying to figure out what happened in an incident like this, and when you have guards who are trying to look in two different barracks, in this case there were 50 people at each barracks. The guard was at one of his stations, which was a hallway. He had two barracks and a hallway, which he had to monitor. But there was no indication in the record as to exactly what he could see. And there was nothing in the record as to why whoever made these staffing requirements decided that one guard could adequately monitor. The affidavit says they can't see the entire barracks when they're in the booth or when in the hall. This is his affidavit. Right. Or when in the hallway, they can only see one barracks at a time. So they can see the barracks if they're walking through the hallway, right? They could not see the barracks. That's correct, Your Honor. It says here they could and only see one barracks at a time. Yes, yes, but they couldn't see everything. And I would suspect. Well, that's not clear. I mean, that's a difficulty. But this all needs to be developed in the record, and Mr. Patterson couldn't develop that. Well, he was there. He could draw a diagram and he could describe. Well, I believe he tried to do that. But one of the problems in this case, also for Mr. Patterson, was everything that he said from what he claimed has been misinterpreted. Not everything he said, but some of the answers that he gave were misinterpreted by the state, saying that he would have admitted to certain things when he hadn't. Well, I wonder, what's the state of the record with respect to that? I noticed there was a tape of the incident. Isn't that correct? Yes, there was a tape. What's the state of the record?  The state of the record is that there is a tape. I understand that from what I read, it's possible that the tape is not complete. From what Mr. Patterson wrote. Sorry, I didn't get my question asked. The question I was going to ask was, does the record indicate whether these TV monitors, whether this tape is monitored at any time, or is it just a camera without a monitor? I don't know the answer to that question. I don't know the answer. I do know that Mr. Patterson asked to see the tape. I don't know if it was monitored. There was testimony that nobody saw the incident. So, whether the tape is supposed to be monitored or whether the camera is supposed to be monitored, at this particular time, it appears that it was not, since there were no eyewitnesses to the incident. That might indicate negligence, but not necessarily a deliberate indifference. But we don't know that. Right. We don't know that. This all has to be developed. And based upon what I learned from talking. I mean, didn't he have access to discovery? I mean, he could have submitted interrogatories or asked for diagrams or things like that. Well, he did send out interrogatories, very inartfully. And he got, he would ask these compound questions, and then the ward gave an answer, yes. And that was it. That was it. He didn't know how to do it. And when you think of, they keep saying, well, he had access to people. He provided affidavits. Well, like he says, if somebody came by his cell who was there that night, he would ask them if they would give an affidavit, and then he would get it. He did not have access to interview any of the officers. In fact, one of the state's problems when they said this was such a complex case, was the fact that these officers, five of the officers who were still current employees, were at other prisons. So Mr. Patterson, he didn't have access to interview officers. Five of them were gone by the time this was ready to be litigated. And one of them was no longer an employee. So he did not have access to anything that involved security. And he says he didn't have access to interviews. In fact, in his motion, he says he didn't have access to those things. Well, turning to the merits, what evidence is there that the defendants were subjectively aware of a substantial risk to the prisoners? Well, they would only be aware of a risk based upon the fact that they have a bunch of high security inmates there, and based upon the fact that they're all there and they're not very well monitored. All right, can you tell me what's the evidence that they're not very well monitored? That's the problem with the record. That is the problem with the record. We only have what Mr. Patterson is saying, but we don't have the shift assignments and we don't have any diagrams. We don't know. So it sounds like your whole argument is the attorney, the appointing of an attorney. Exactly. Are you willing to concede that the record as it stands, summary judgment, was proper? I'm willing. I hate to concede that, Your Honor, because I feel like summary judgment was so improper because they never gave the man a chance to prove everything. The findings of the court, when you take a look at this order, he says that the appointment of counsel did not provide a sufficient reason for the court to reconsider that ruling after Patterson, on a second motion, goes through everything he hasn't been able to prove. So the court had to know that there was not enough evidence in the record because Patterson was telling them that. He was saying, I can't get this stuff. I can't prove my case. I mean, obviously, he couldn't prove his case because he didn't have a security expert. He didn't have access to the staffing or the reports or the interviews or the videos. He couldn't interview anybody. When you look at how we prepare cases today and how Patrick Patterson got to, with one eye now. He could have gotten the reports, couldn't he? No. Did he ask for them? He says that he did in here. Well, there should be something in the record, right? Yes. A document request or something like that? Yes. He's saying that he's not getting these things. He said, in fact, in his first... Did he submit a document request that asked for the reports of the incident? Yes. There's a discovery request in here. He did discovery motions. He says, and in fact, he says in his counsel request, it's a no-brainer. I'm not going to be given access to do any interviews of eyewitnesses. So he's not going to be given access to these reports. In his second request for counsel, he goes through. That's document number 69. He goes through where they're saying that he admitted to different things. He's saying, I didn't admit to different things. And I don't know exactly where it says that he didn't get reports. There was one point at which they refused to give him some information because that kind of information would not be given to inmates. That's correct. That's my recollection. Yes, that is correct. I think that had to do with the number of assaults, the frequency of assaults and things of that sort is my recollection. Well . . . I'm not sure, but if I may ask a question on the merits. Yes. The magistrate judge and consequently the district judge concentrated mainly on the notion that this was a surprise attack case, which I think it really wasn't from the beginning. I think they were quite right. It was not one that was meritorious. But the magistrate judge also intimated or said directly that it would be speculative to conclude that some particular level of staffing would have prevented this incident anyway. So what's your take on that? As I recall, the record is that this gentleman was attacked for about two minutes and then left to his own devices, and then the attacker came back and attacked him again, and that the entire incident took about ten minutes. Yes, and then staff came in. I'm sorry? And then staff came in and helped. But in any event, the actual altercation was only for a couple of minutes. So how do we know that a two-minute altercation would have been detected by something called a proper level of staffing anyway? Isn't there a leap of faith there somewhere? I don't think there's a leap of faith. I think that if somebody is supposed to be monitoring a barracks, there is a monitor there. Even if they're not physically present, there should be a monitor. So somebody should be watching constantly? Yes. The Constitution requires constant watching? The Constitution requires that if you're going to lock them up, that these inmates be protected. I understand that. But, I mean, specifically, is that what you're saying, that there has to be somebody eyes on 24-7? Yes. I'm saying that there is. I just want to make sure what your position is. My position is that there has to be adequate monitoring so an attack like this can be. Well, what's adequate is my question. Well, adequate is this was clearly not adequate. There has to be checking enough times. Or is there strict liability? Well, I don't know that you can say that this is. Counsel, isn't there evidence in the record showing that, as far as the affidavits are concerned, that the officer on duty could not even see the site of the attack from the observation booth? That's correct. But there should have been a monitor where somebody could have seen. There are cameras there on the door, and there was a camera that recorded part of the attack. May I reserve the rest of this? May I just say, though, it appears from his own affidavit they could see from the hallway. It's my understanding that Maserati or whatever his name was could not see from the hallway. Can only see one barracks at a time in the hallway. The bed where I was assaulted 23 times with a weapon and stomped on six times for approximately 11 minutes cannot be seen from the booth. It doesn't say it could not be seen from the hallway. I believe the officer, though, said that he could not see the barracks. From the hallway? From the hallway, yes. That particular corner? Yes. That is my recollection of his affidavit. Where is that? In his affidavit, did you say? Yes, Maserati. I'll try to find it. Thank you. Thank you very much. Very well. Good morning. May it please the Court. I'm Assistant Attorney General Cat Hodge, and I represent the Arkansas Department of Correction at Appalooze in this matter. Mr. Patterson essentially asked this court to go against nearly 30 years of precedent where this court has found that qualified immunity protects prison officials in cases that are categorically similar to the one at Barr. Mr. Patterson would have this court declare that open barracks in prisons are unconstitutional unless they are visually monitored 24 hours a day, something this court has never required and something the United States Supreme Court has never required, even considering attacks on inmates. In fact, this court has held repeatedly that officers are entitled to qualified immunity in Eighth Amendment cases and surprise inmate attacks just like this one, Well, in this case, I think the case is a little different because the claim is that there was a part of the barracks that simply wasn't visible at all and unmonitorable unless perhaps by these cameras. Is that not the claim? No, Your Honor. And in fact, the record, the district court found that the record supports that the officer assigned to 13 and 14 barracks can visually monitor and does visually monitor the barracks every half hour. All of the barracks? Yes, Your Honor, from the control booth and the hallway. And what the district court's decision makes clear and the record makes clear, Is there a factual dispute on that question or not? There is not a factual dispute. Your Honor, read from the affidavit, Mr. Patterson maintains that his particular bunk could not be viewed from the control booth, but the undisputed facts in the record indicates that the entire hallway where 13 and 14 barracks is situated is made of glass and that the officer monitoring both of those barracks can view each of those barracks from the hallway, which is made of all glass. He can view visually inside each of the barracks. Okay, but including the spot where the attack took place? Yes, Your Honor. Okay. Well, there seems to be some conflict here between that statement of the record and what was previously said about the affidavit of Mr. Mazzanti saying that you couldn't see. And that's not an accurate reflection of the record. Mr. Mazzanti has not put an affidavit in the record, but Mr. Patterson did participate vigorously in discovery and he propounded discovery to Officer Mazzanti who verified that he was able to perform visual inspections of the barracks from both the control booth and the hallway. There is no statement by Officer Mazzanti in the record that he was unable to view Mr. Patterson's barracks from his position. There's no statement that he was able to see this particular part, though, right? Just generally speaking, he could see in the barracks. I believe that's correct, Your Honor, that he's able to perform. Okay, so, but, so. Counsel, the plaintiffs have submitted affidavit evidence, which the state disputes, purporting to show that the location of the assault could not even be viewed from the control booth and that security checks were routinely not performed at all. Explain to me how that does not show that there's an existence of a genuine issue of material fact that's in dispute here. Yes, Your Honor. Even though Mr. Patterson alleges that his bunk could not be seen from the control booth, there is no indication in the record that his bunk could not be seen from the hallway. And the district court's order finds that the record supports that Mr. Mazzanti was able to view both of the barracks, 13 and 14 barracks, either from the control booth or the hallway, and that at the time of the incident, Mr. Mazzanti was in either of those two places, which is where he was supposed to be. The four affidavits submitted by the inmates are simply irrelevant because they provide hearsay testimony or purport to provide hearsay testimony about other officers allegedly not performing security checks, I believe, in 2011. Those affidavits were not relevant to the March 16th incident. They did not speak specifically to barracks 13. And more importantly, the undisputed facts in this case demonstrate that barracks 13 and 14 was properly staffed. Officer Mazzanti was the officer assigned the entire time to barracks 13 and 14. I'm sorry, counsel. I think what you're saying is that they were properly staffed in accordance with the regulations of the prison. Yes, Your Honor. But our question is different from that, and that is whether the staffing was proper in the sense that it met the requirements of the Constitution. And it did, Your Honor. Well, that is disputed. I mean, that's the claim. And I would point this court to the decision in Tucker v. Evans where this court granted qualified immunity to not only the officer who was assigned to the control booth, but the warden as well. In that case, the inmate's estate alleged deliberate indifference and raised staffing issues pointing to this court's decision in Finney and Smith v. Arkansas Department of Correction. And before I discuss and distinguish those cases, the setup in the Tucker v. Evans case was exactly as it was at the Varner unit. You had one officer, Officer Daniels, assigned to seven and eight control booths, and he was required to monitor both of those areas. An inmate was involved in an altercation and was subsequently killed on that evening, and his estate brought a claim against the officer in the control booth alleging that he failed to take notice that the inmate was being assaulted. And this court granted qualified immunity in that case to the officer. An assertion that the attack took place in a part of the barracks that could not be viewed. I'm not sure if that was a fact at issue, but one of the facts was that the— That's the whole case here, really. I mean, can you see or not? Well, one of the facts at issue in the Tucker case was whether or not the officer was performing his job responsibilities in a way that would have led him to discover the attack, and that's the exact claim that Mr. Patterson makes. He claims that if Mr. Mazzanti had been performing his job duties a little better, then he would have known— Well, that's the claim against Mr. Mazzanti. That's true. But the general—it seems to me, by the way, that Mr. Mazzanti, having no control over staffing levels, can hardly be faulted for not controlling staffing levels properly. So it seems to me the case against Mr. Mazzanti is pretty weak. But the general case has to do with whether the staffing levels were sufficient to meet the constitutional requirements that prisoners be protected from obvious risks and that prison officials don't deliberately ignore those risks, right? Yes, Your Honor. And in this case, the record does not support that Mr. Patterson was confined in a manner that posed an obvious risk of harm, and that is the issue, that the officials, including Mr. Mazzanti and the other ADC officials, were not subjectively aware that he faced an excessive risk of harm. And that's because the state of the record is that the plaintiff hasn't shown that this attack took place in a part of the barracks that could not be seen from the hallway. Is that the reason? No, Your Honor. The reason is because Mr. Patterson failed to demonstrate that he was confined under circumstances that presented an excessive risk of harm. But if he's in a part of the barracks that he can't be seen, it seems to me that's kind of an obvious risk. That's the whole case, isn't it? No, Your Honor. And in fact, the obvious risk, there is no obvious risk here. In fact, this court should look to Mr. Patterson's testimony where he testified that he has been housed at the Varner Unit for nearly two decades, 18 years. And in those 18 years, with the exception of one other minor physical altercation, he has had virtually no problems being housed at the Varner Unit. That's important, Your Honor, because that demonstrates that the prison officials are not subjectively aware of any obvious risk of harm to him. Violence is not rampant at the Varner Unit. What's the source of the evidence that the monitor couldn't see the entire area? There is no evidence supporting that. In fact, the… Well, I think at least some of the inmates said that. I don't believe that there was an inmate that said that the entire area could not be viewed. Mr. Patterson claimed… Well, on the monitor, as opposed to walking down the hall. On the monitor? Yes. Oh, okay. I misunderstood Your Honor's question. Okay. So what's the source of that evidence? Is it only the inmates? Will you re-ask your question? Yes. Walking down the hall is one visual way of seeing it. And another is the monitor, correct? The cameras of some sort. Yes, Your Honor. Okay. I believe there's evidence in the record that the cameras don't cover the entire area. That there's a blank area, right? I'm not sure if that's an allegation, but the video… The camera, the video that was submitted in the district court, shows four different angles of the barracks, both inside… Judge Arnold just read from the affidavit a few minutes ago, where I think the plaintiff himself said that the monitor doesn't cover the entire area. I understood that Judge Arnold was reading from an affidavit where Mr. Patterson said his bunk could not be viewed from the control booth, which is not… Okay. That's what I mean. When I say monitor, I mean control booth. Okay. I thought you meant the camera. I'm sorry, Your Honor. It's not clear there are monitors in the control booth. There are not monitors in the control booth. Okay. I see. So it's just from the control booth. The source of that is the prisoners, right? Yes. Mr. Patterson. Did the defendants dispute that at all? Or do they concede that there are areas that can't be viewed from the control booth? I don't believe that was addressed in the district court record. I believe Mr. Mazzanti, the record indicates that he can see collectively, either in the control booth or in the hallway, that he can view both 13 and 14 barracks. On the question of appointment of counsel, you sought a… You or the state sought an extension one time citing the complexity of the case. Is that right? Yes. The counsel for the ADC did. And that's sort of inconsistent with the district court's finding and denying counsel that the case wasn't complex? Yes and no, Your Honor. Your Honor, this court considers whether or not the district court abused its discretion. And the district court has given vast discretion in determining whether or not an inmate is entitled to counsel in a civil case. It's not whether or not the ADC alleged that the case was complex. It's whether or not the district court abused its discretion in deciding that it was not. In this case, it's clear that the district court disagreed with both the appellee and the appellant that the case presented factual and legal complexities. In fact, Mr. Patterson's response to the motion for summary judgment, both motions for summary judgment indicate that he was able to make references to the record. He provided citations to the law. He raised specific cases that he wanted the court to consider in ruling on his claim. His pleadings are tight. He makes adequate reference to the record. He was not required to present a novel legal issue. The Eighth Amendment claim has been well settled since the United States Supreme Court's decision in Farmer. He addressed and raised the Finney cases, the Smith cases, and the Crane cases, which are all distinguishable because there was no obvious risk of harm to Mr. Patterson on the record before the trial court. And so appointment of counsel was simply not necessary. He faced no procedural hurdles. He was able to file many documents and have them considered and ruled upon by the court. Counsel, on page six of the magistrate's recommended disposition of this case in footnote six, it says that for security reasons, a correctional officer is not allowed to enter a barracks alone. Wouldn't that show that there's an obvious risk here that was well known to the defendants? Not to Mr. Patterson, to staff, because the security officer would be outnumbered. But if a maximum security facility with open barracks was actually not conducting visual observation, wouldn't that be deliberate indifference to a known risk? Will you repeat the question? If visual observation was actually not being performed, there's a dispute in the record as to whether or not they were being performed. Would you agree that if a maximum security facility was not performing visual observation of an open barracks, that that would be deliberately ignoring a known risk? No, Your Honor, for two reasons. So they don't have to observe at all? They do have to observe. What if they were observing from a place where you couldn't see? I'll try to answer the first question and then get to your second question, Your Honor. Assuming that the officer on an occasion was not performing his job responsibilities, that may point to gross negligence, but that would be insufficient to meet the Eighth Amendment standard. In this case, merely housing Mr. Patterson in a maximum security unit does not in and of itself constitute per se deliberate indifference. This court has repeatedly said that an inmate is a murderer or is housed in a maximum security prison does not necessarily mean that there's an obvious risk of harm. There has to be subjective knowledge of a risk, and here there is none. The prison officials were not aware. Their violence wasn't rampant. Mr. Patterson did not report the previous altercation between himself and Mr. Black. There was no way for any official to know that he faced any risk of harm on the day of March 16th. And, Your Honor, I'm out of time, but I'm happy to answer further questions. I thought there was something in the record that indicated that the officers avoided this part of the barracks because it was not easy to see. No, Your Honor. Is that not true? No, Your Honor. I don't believe the record supports that. No statement by any of the other prisoners to that effect? Not for Barracks 13, no, Your Honor. In fact, the affidavits, if my memory serves me correctly, the four affidavits submitted by inmate witnesses do not address Barracks 13 at all, which is where Mr. Patterson was housed. Thank you. Thank you, Your Honor. Thank you. Rebuttal. I think that was an excellent point that Judge Gras made, that if officers can't go into the barracks alone, obviously there's some kind of a danger that exists in a dormitory setting with high security inmates. And I could not find, I don't think that there is a misandry. Well, that would probably be true of every prison, wouldn't it? Yes. They don't send single guards into an area with many prisoners. If there's a situation, then they call a lot of force in to take care of it. Yes. Well, if there was a monitor, if there was somebody monitoring what was going on in the barracks, then somebody would be able to see what was going on if an officer entered the barracks. Sorry. Was there something in the record about how officers or other prisoners avoided the blind spot in the barracks? That was, I believe, from Mr. Patterson. Okay. The only really negative information in here came from Mr. Patterson or other inmates, mainly because he didn't have the ability to interview. Did he say that, that other inmates avoided that? I think that he did. I'm just, I am so sorry. That's my recollection. Okay, that's fine. That is my recollection. That's why we're here, to find out. I know, and that's my recollection of Mr. Patterson's statement. I'm not saying that you fell down in any respect. I'm just asking. It's not a rhetorical question. No. I understand, Your Honor. There was a point. The one point I really wanted to make also, in the opinion when the court criticizes Mr. Patterson for not producing any evidence that subjectively the defendants were deliberately indifferent, that is the whole problem here, that no, he was not allowed to put any evidence in the record because he didn't have access to the record. He didn't have access to anything that was important where he could have proven his case. So saying, well, you can't. I'm sorry, I'm out of time. Can I finish the sentence? Sure. Thank you. When they say, well, you didn't put any evidence. Well, the evidence, he was blocked from any evidence. So I hope that you will find it his favor. Thank you. Okay, very well. Thank you. We appreciate your taking this case and both of your arguments today. The case will be submitted and decided in due course.